# IN THE COURT OF APPEALS OF IOWA

No. 19-2022
Filed June 16, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DAVID LEE ROY SMITH,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Buchanan County, Joel A. Dalrymple, Judge.

David Smith appeals his convictions for burglary in the third degree, enhanced as a habitual offender; theft in the second degree, enhanced as a habitual offender; and criminal mischief in the fourth degree. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Considered by Doyle, P.J., Ahlers, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**GAMBLE, Senior Judge.**

David Smith appeals his convictions for burglary in the third degree, enhanced as a habitual offender; theft in the second degree, enhanced as a habitual offender; and criminal mischief in the fourth degree. We affirm.

## I. Background Facts

One afternoon in November 2017, Curt Kass returned home to discover a broken window at the back of his house. Kass noticed tracks between the window and the neighbor's property. The tracks ended at the neighbor's rock driveway. Once inside, Kass found the house "had been kind of turned upside down. Somebody had been in there, stole a bunch of things." So Kass called law enforcement and provided law enforcement with a list of missing items.

Patrol Sergeant Joseph Schwinghammer responded to Kass's call. Schwinghammer observed the broken window in the back of the house and noticed a Waste Management garbage can by the window. It appeared to Schwinghammer that someone climbed on the garbage can to get into the window.

Kass suspected the neighbor's son, who he described as "not a model citizen," and informed Schwinghammer of his suspicions. Schwinghammer knocked on the neighbor's door and noticed a television on inside. But no one answered, and when Schwinghammer tried a second time, the television was turned off and no one answered.

Schwinghammer inspected inside Kass's home, but he was not able to locate any fingerprints or footprints. However, Schwinghammer located a pair of rubber gloves found beside a large dining room table. The gloves did not belong to Kass. Schwinghammer inspected the gloves and noticed blood on one of them.

The blood "was dry enough that it didn't run off the glove," but not so dry that it cracked or was hard. So he bagged them up and sent them to the division of criminal investigation criminalistics (DCI) laboratory. Testing showed two DNA contributors, a major and a minor contributor. Schwinghammer received a report from the DCI lab, which stated the lab located a major and a minor DNA contributor on the gloves and that DNA potentially matched Smith.

So Schwinghammer arranged to meet with Smith to collect a DNA sample from him. At that time, Smith inquired whether Schwinghammer believed more than one person was involved but also told Schwinghammer he did not want to discuss it at that time but would discuss it at a later date. Smith informed Schwinghammer there was "a lot more to this than he knows." Smith also stated he knew what house was burglarized and had been there as a boy.

After Schwinghammer sent Smith's DNA sample to the DCI lab, the lab confirmed Smith's DNA matched the major contributor DNA found in the glove. So Schwinghammer called Smith with the news, and Smith turned himself in to authorities.

The matter proceeded to a jury trial, where Smith testified in his own defense. Trying to explain how a glove with his DNA was found in Kass's home, Smith offers two explanations. Smith testified that around the time of the burglary he had put most of his things in storage. But when he went to retrieve his belongings, he found his padlock had been cutoff and replaced. And Smith said he had some gloves like those found in Kass's home in the storage unit that someone could have taken. Alternatively, he said he used that type of glove often and thought someone could have taken some from a dumpster after he disposed

of them.  Smith also testified that he still has a box of the gloves.  Smith testified, "I always use them."

Smith discussed his physical health and testified he had hampered mobility due to a back injury.  And claimed he could not physically climb into the house through the broken window or carry the stolen items away.  And, while testifying, Smith denied ever being to Kass's home as a boy or, if he was, it would have been with his dad when he was six years old.  He also denied he would leave his nine-year-old son at home alone to commit a burglary.

The case was submitted to the jury, which found Smith guilty on all counts.  Smith then stipulated to his habitual offender status.  He now appeals, challenging the sufficiency of the evidence.

## II. Scope and Standard of Review

We review challenges to the sufficiency of the evidence for corrections of errors at law.  *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

> In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence."  "[W]e will uphold a verdict if substantial record evidence supports it."  We will consider all the evidence presented, not just the inculpatory evidence.  Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.  "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence."

*Id.* (alterations in original) (citations omitted).

### III. Discussion

On appeal, Smith argues there is insufficient evidence supporting his conviction. He claims the only evidence tying him the scene was the DNA found on the gloves, which had two DNA contributors.[1] But we think Smith takes a narrow view of the evidence by asserting the only evidence incriminating him is his DNA on the gloves.

The gloves were left in the home during the burglary, leading to a fair inference that they were used and left by the perpetrator. Smith freely admitted he uses the type of disposable glove discovered at the scene of the crime all the time, establishing that he had ready access to that type of glove. He told Sargent Schwinghammer there was "a lot more to this" than Schwinghammer knew when Schwinghammer collected a DNA sample from him, indicating he had knowledge of the crime. And Smith told Schwinghammer he had been to the home when he was a boy, establishing Smith was familiar with the residence. This circumstantial evidence in conjunction with Smith's DNA on the gloves at the scene ties Smith to the crime and sufficiently establishes his identity as the perpetrator. *See State v. Armstrong*, No. 12-0426, 2013 WL 2107400, at *4 (Iowa Ct. App. May 15, 2013)

---

[1] Smith points us to a California case where a California appellate court reversed a defendant's conviction when the only evidence tying him to the crime scene was his DNA on a rock used to smash in a storefront. *See People v. Arevalo*, 170 Cal. Rptr. 3d 286, 287 (Cal. Ct. App. 2014), *ordered not to be published* July 30, 2014. He also relies on *Mikes v. Borg*, 947 F.2d 353, 361 (9th Cir. 1991), which determined a defendant's right to due process was violated when the prosecution theorized the defendant's fingerprints were left on the murder weapon at the time of the killing but failed to establish the murder weapon was not accessible to the defendant prior to the offense. Because we conclude additional evidence beyond the DNA evidence supports Smith conviction, we need not compare Smith's case to these forensic-evidence-only cases.

("Armstrong's DNA was found on a do-rag, which was recovered at the scene of the crime in a bedroom where one of the victims was beaten, dragged, and pistol-whipped. This evidence not only tends to connect Armstrong to the crime, it is sufficient circumstantial evidence to support a jury finding, beyond a reasonable doubt, that Armstrong was one of the perpetrators." (footnote omitted)); *see also State v. Carter*, No. 16-2184, 2018 WL 2731615, at *3 (Iowa Ct. App. June 6, 2018) (holding the defendant was not convicted on DNA evidence alone when other circumstantial evidence also tied him to the crime); *State v. Henderson*, No. 15-1166, 2017 WL 108280, at *5 (Iowa Ct. App. Jan. 11, 2017) (holding circumstantial evidence and DNA evidence was sufficient to establish the defendant's identity as the perpetrator).

Smith asserts his denial is more persuasive because it would be physically difficult for him to crawl through the window and carry the heavier items taken. He argues the gloves could have been taken from his storage unit when the lock was changed or the dumpster at his parents' house. And he suggests he couldn't have committed the crime because he would have had to leave his son home alone and would not do that. Contrary to what he told Schwinghammer, Smith testified he did not go to the Kass home as a boy unless it was with his dad when he was six. But the jury was free to reject Smith's contentions. *Sanford*, 814 N.W.2d at 615. Smith admitted he had been convicted of more than a dozen felonies involving crimes of dishonesty over three decades.

Finally, Smith takes issue with Schwinghammer's failure to investigate the neighbor further. The tracks ended in the neighbor's rock driveway and did not go to the house. In addition, the DNA lead was compelling, and it was reasonable for

Schwinghammer to follow it. The DNA lead led Schwinghammer away from the neighbor and to Smith.

So we conclude the State presented sufficient evidence for the jury to conclude beyond a reasonable doubt tying Smith to the crime and establishing his identity as the perpetrator.

**AFFIRMED.**